AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
District of Colorado

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>The e-mail account and information associated with brevis@auxmg.com that is in the possession of Microsoft, whose office is located at One Microsoft Way, Redmond, Washington, 98052 more fully described in Attachment A, attached hereto. | )<br>)<br>)  Case No.  17-sw-05962-STV<br>)<br>)<br>) |

**APPLICATION FOR A SEARCH WARRANT**

I am a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A attached hereto and hereby incorporated by reference.

located in the ____State and____ District of ____Colorado____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B attached hereto and hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 201(b)(1)(b) | Bribery of public officials and witnesses |

The application is based on these facts:

See Attachment C and Affidavit attached hereto and hereby incorporated by reference.

☑ Continued on the attached affidavit, which is incorporated by reference.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

s/ Scott Alexander
*Applicant's signature*

Scott Alexander, Special Agent, FBI
*Printed name and title*

Sworn to before me and: ☐ signed in my presence.

☒ submitted, attested to, and acknowledged by reliable electronic means.

Date: Jully 25, 2017

*Judge's signature*

City and state: Denver, Colorado

Scott T. Varholak, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A
## DESCRIPTION OF LOCATION TO BE SEARCHED

Information associated with the e-mail account known as "brevis@auxmg.com" (hereinafter and in Attachment B "SUBJECT ACCOUNT") which are in the possession of or under the control of the E-mail and Internet Service Provider MICROSOFT, whose office is located at One Microsoft Way, Redmond, Washington 98052 (hereinafter and in Attachment B "PROVIDER.")

## ATTACHMENT B
## DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED

Pursuant to 18 U.S.C. § 2703, PROVIDER as described in Attachment A is hereby ordered as follows:

### I.     SEARCH PROCEDURE

a. The search warrant will be presented to personnel of the PROVIDER, who will be directed to isolate those accounts and files described in Section II below regardless of whether such information is stored, held or maintained inside or outside of the United States;

b. In order to minimize any disruption of computer service to innocent third parties, the PROVIDER'S employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the computer accounts and files described in Section II below, including an exact duplicate of all information stored in the computer accounts and files described therein;

c. The PROVIDER'S employees will provide the exact duplicate in electronic form of the accounts and files described in Section II below and all information stored in those accounts and files to the agent who serves the search warrant; and

d. Law enforcement personnel will thereafter review all information and records received from the PROVIDER'S employees to determine the information to be seized by law enforcement personnel specified in Section III.

### II.    FILES AND ACCOUNTS TO BE DISCLOSED BY THE PROVIDER'S EMPLOYEES

a. For the SUBJECT ACCOUNT listed in Attachment A [for the time period from the date the SUBJECT ACCOUNT were created, to the date the PROVIDER collects the data in response to this order the PROVIDER shall disclose the following information, and the disclosure shall include all information even if deleted yet still available to the PROVIDER, and all information preserved pursuant to a request under 18 U.S.C. § 2703(f):

1. The contents of all e-mails and attachments associated with the SUBJECT ACCOUNT, including deleted, stored, or preserved (pursuant to 18 U.S.C. § 2703(f) or otherwise) e-mails sent to and from the account, draft e-mails, existing printouts of any such e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-

    mail;

2. All records or other information regarding the identification of the SUBJECT ACCOUNT, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses, phone numbers, or other identifying information provided during registration, other associated e-mail accounts, all screen names associated with the subscribers and/or accounts, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

3. All records indicating the services available to subscribers of the SUBJECT ACCOUNT;

4. The services the SUBJECT ACCOUNT utilized and all records generated by those services;

5. All records or other information stored at any time by an individual using the SUBJECT ACCOUNT, including address books, contact and buddy lists, calendar data, pictures, and files;

6. All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT ACCOUNT, including contacts with support services and records of actions taken.

7. For all information responsive to this warrant, regardless of whether such information is stored, held or maintained inside or outside of the United States, the physical location or locations where the information is stored.

b. The Provider is hereby ordered to disclose the above information to the government within 14 days of the issuance of this warrant.

### III.    INFORMATION TO BE SEIZED BY LAW ENFORCEMENT PERSONNEL

a. All information described above in Section II that constitutes fruits, evidence and instrumentalities of violations of 18 USC 201 (b)(1)(b):

1. All electronic mail, attachments, and related computer files related to brevis@auxmg.com. All electronic mail, attachments, and related computer files related to Robert Revis, brevis@auxmg.com, or employees of these companies.
2. Records relating to who created, used, or communicated with the SUBJECT ACCOUNT or identifier, including records about their identities and whereabouts.

### IV.  ORDER OF NON-DISCLOSURE AND TO KEEP ACCOUNT ACTIVE

a. Pursuant to 18 U.S.C. §§ 2703(b)(1)(A) and 2705(b), the Court orders PROVIDER not to disclose the existence of this search warrant to any person, including the subscriber, other than its personnel essential for compliance with the execution of this warrant.

b. The Court further orders PROVIDER to continue to maintain the SUBJECT ACCOUNT in an open and active status so as not to disrupt this ongoing investigation.

### V.  PROVIDER PROCEDURES

a. The PROVIDER shall deliver the information set forth above within 14 days of the service of this warrant and the PROVIDER shall send the information via facsimile or United States mail, and where maintained in electronic form, on CD-ROM or an equivalent electronic medium, to:

> Special Agent Scott Alexander
> FBI – Denver
> 8000 E. 36th Ave.
> Denver, CO 80238
> b.alexander@ic.fbi.gov

b. Pursuant to 2703(g), the presence of an agent is not required for service or execution of this warrant.

### VI.  DEFINITIONS

a. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored.

## ATTACHMENT C
## AFFIDAVIT

I, Scott Alexander being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

### INTRODUCTION AND AGENT BACKROUND

1. I am a Special Agent of the Federal Bureau of Investigation (FBI), and have been since March 3, 2008. As part of my duties, I investigate criminal violations related to public corruption matters and have experience in working gang and narcotic investigations as well. Since March of 2015, I have worked federal violations related to public corruption investigations and have experience in working Title 18 United States Code, Section 201 and other federal violations. Additionally, I have received training and instruction related to criminal acts being discussed through electronic media as well as other electronic communications. Furthermore, as part of my training and experience, I have participated in investigations involving electronic evidence, emails, text messages, and the Internet.

2. This affidavit is made pursuant to Title 18, United States Code, Section 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), in support of an application for a warrant to search the e-mail account described in Attachment A (hereinafter "SUBJECT ACCOUNT") and all content found therein, there being probable cause to believe that located in the place described in Attachment A are items described in Attachment B, being evidence, fruits, and instrumentalities of violations of 18 USC 201(b)(1)(b).

3. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause that evidence, fruits, and instrumentalities of violations of 18 USC 201(b)(1)(b) are present at the location described.

4. The information contained within the affidavit is based on my training and experience, as well as information imparted to me by other law enforcement officers involved in this investigation.

### DEFINITIONS

5. The following definition applies to this Affidavit and Attachment B to this Affidavit.

6. In this affidavit, the terms "computers" or "digital storage media" or "digital storage devices" may be used interchangeably, and are intended to include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, game consoles, network hardware,

1

hard disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical storage media.

## BACKGROUND REGARDING THE INTERNET

7. As part of my training, I have become familiar with the Internet (also commonly known as the World Wide Web), which is a global network of computers and other electronic devices that communicate with each other using various means, including standard telephone lines, high-speed telecommunications links (e.g., copper and fiber optic cable), and wireless transmissions, including satellite. Due to the structure of the Internet, connections between computers on the Internet routinely cross state and international borders, even when the computers communicating with each other are in the same state. Individuals and entities use the Internet to gain access to a wide variety of information; to send information to, and receive information from, other individuals; to conduct commercial transactions; and to communicate via electronic mail ("e-mail"). An individual who wants to use Internet e-mail must first obtain an account with a computer that is linked to the Internet – for example, through a university, an employer, or a commercial service – which is called an "Internet Service Provider" or "ISP" (see definition of "Internet Service Provider" below). Once the individual has accessed the Internet, that individual can use an e-mail account provided by their ISP or they can use the Internet to connect to public web-based e-mail services to send and receive e-mail. Web-based e-mail services provide e-mail accounts that may be accessed from any computer that has access to the Internet. In addition, the individual can access websites using web browsers to view or download content, or make purchases. The Internet may also be used to access online groups such as chat rooms, websites, social media, newsgroups and video conferencing.

8. **E-mail Provider:**

    A. In my training and experience, I have learned that Microsoft (hereinafter "Provider") provides a variety of on-line services, including search tools, advertising services, communication and publishing tools, development tools, mapping tools, cloud storage, desktop applications, and electronic mail ("e-mail") access, to the general public. Subscribers obtain an account by registering with Provider. During the registration process, Provider asks subscribers to provide basic personal information. Most public providers do not validate the information provided, however. Nevertheless, the computers of Provider are likely to contain stored electronic communications (including retrieved and unretrieved e-mail for Provider subscribers) and information concerning subscribers and their use of Provider services, such as account access information, e-mail transaction information, and account application information.

    B. In general, an e-mail that is sent to a Provider subscriber is stored in the subscriber's "mail box" on Provider servers until the subscriber deletes the e-mail, or until a preservation letter is sent to the e-mail provider. If the subscriber does not delete the message, or if the e-mail provider preserves the content of the account pursuant to a

2

preservation letter, the message can remain on Provider servers indefinitely.

C. When the subscriber sends an e-mail, it is initiated at the user's computer, transferred via the Internet to Provider servers, and then transmitted to its end destination. Provider often saves a copy of the e-mail sent. Unless the sender of the e-mail specifically deletes the e-mail, or if the e-mail provider preserves the content of the account pursuant to a preservation letter, the e-mail can remain on the system indefinitely.

D. Provider subscribers can also store files, including e-mails, address books, contact or buddy lists, pictures, and other files, on servers maintained and/or owned by Provider.

9. **Internet Service Providers ("ISPs"):**

A. ISPs are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet including telephone based dial-up, broadband based access via digital subscriber line (DSL) or cable television, dedicated circuits, or satellite based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, that the connection supports. Many ISPs assign each subscriber an account name – a user name or screen name, an "e-mail address," an e-mail mailbox, and a personal password selected by the subscriber. By using a computer equipped with a telephone or cable modem, the subscriber can establish communication with an ISP over a telephone line or through a cable system, and can access the Internet by using his or her account name and personal password.

B. ISPs maintain records ("ISP records") pertaining to their subscribers (regardless of whether those subscribers are individuals or entities). These records may include account application information, subscriber and billing information, account access information (often times in the form of log files), e-mail communications, information concerning content uploaded and/or stored on or via the ISP's servers, and other information, which may be stored both in computer data format and in written or printed record format. ISPs reserve and/or maintain computer disk storage space on their computer system for their subscribers' use. This service by ISPs allows for both temporary and long-term storage of electronic communications and many other types of electronic data and files. Typically, e-mail that has not been opened by an ISP customer is stored temporarily by an ISP incident to the transmission of that e-mail to the intended recipient, usually within an area known as the home directory. Such temporary, incidental storage is defined by statute as "electronic storage," see 18 U.S.C. § 2510(17), and the provider of such a service is an "electronic communications service." An "electronic communications service," as defined by statute, is "any service which provides to users thereof the ability to send or receive wire or electronic communications. 18 U.S.C. § 2510(15). A service

3

provider that is available to the public and provides storage facilities after an electronic communication has been transmitted and opened by the recipient, or provides other long term storage services to the public for electronic data and files, is defined by statute as providing a "remote computing service." 18 U.S.C. § 2711(2).

10. Internet Protocol Address ("IP Address"): Every computer or device on the Internet is referenced by a unique Internet Protocol address the same way every telephone has a unique telephone number. An IP address is a series of numbers separated by periods; an example of an IP address is 192.168.10.102. Each time an individual accesses the Internet, the computer from which that individual initiates access is assigned an IP address. A central authority provides each ISP a limited block of IP addresses for use by that ISP's customers or subscribers. Most ISPs employ dynamic IP addressing, that is they allocate any unused IP address at the time of initiation of an Internet session each time a customer or subscriber accesses the Internet. A dynamic IP address is reserved by an ISP to be shared among a group of computers over a period of time. The ISP logs the date, time and duration of the Internet session for each IP address and can identify the user of that IP address for such a session from these records. Typically, users who sporadically access the Internet via a dial-up modem will be assigned an IP address from a pool of IP addresses for the duration of each dial-up session. Once the session ends, the IP address is available for the next dial-up customer. On the other hand, some ISPs, including most cable providers, employ static IP addressing, that is a customer or subscriber's computer is assigned one IP address that is used to identify each and every Internet session initiated through that computer. In other words, a static IP address is an IP address that does not change over a period of time and is typically assigned to a specific computer. A modem is an electronic device that allows one computer to communicate with another.

11. A host computer is one that is attached to a dedicated network and serves many users. These host computers are sometimes commercial online services, which allow subscribers to connect to a network, which is in turn connected to their host systems. These service providers allow electronic mail service between their own subscribers, and those of other networks or individuals on the Internet.

12. Some of these systems offer their subscribers the ability to communicate publicly or privately with each other in real time in the form of "chat rooms." Contact with others online can be either open and anonymous, or private and personal in the form of person-to-person instant messages.

13. Further, the online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. These online storage accounts are often free but can involve a charge. A subscriber assigned a free online storage account frequently can set up such accounts by providing limited identifying information. Any information provided is frequently fictitious in an attempt to preserve the anonymity of the user. Consequently, even if it is known that a particular user is a subscriber of a free online storage service,

the service provider frequently will have no records in that subscriber's name. Instead, the online service will only be able to identify files, that are associated with a "login," or unique, user-created identity the subscriber uses to "log on" to the online service. Such an online storage account is particularly useful to create an anonymous account to conduct and facilitate illegal activity. Such a subscriber can collect, store, view and distribute electronic files directly from the online service. Consequently, files that may be evidence of a crime may also have minimal contact with the subscriber's home computer. The subscriber can also manipulate the files on an online storage service from any computer connected to the Internet. Nonetheless, evidence of an online storage account is often found on a home computer of a user subscribing to such a service. Evidence of an online storage account may take the form of passwords located in encrypted, archived , or other files on the user's home computer. Other evidence can also be found through unique software that may exist on a user's home computer that has been developed by the online storage service. This unique software will frequently contain evidence not only of the existence of such accounts, but the login and password.

### INVESTIGATION AND SUBJECT OF SEARCH WARRANT

14. In September of 2013, the FBI opened an investigation into the allegation that Dwane E. Nevins, who is a public official employed by the U.S. Department of Veteran's Affairs as a Small Business Specialist, was misusing his position and seeking a personal monetary gain in order to make opportunity for the commission of a fraud on the United States. The allegation was related to the bribery of a public official (Nevins) who was working with a company identified as Auxilious in an attempt to secure government contracts. The owner of the Auxilious was identified as Robert "Bob" Revis and Revis' partner is Anthony "Tony" Bueno. All three individuals are subjects in this investigation.

15. During the course of this investigation, three undercover employees (UCE) were utilized to infiltrate the group and learn of the inner workings related to the conspiracy to fraud the government. Investigators utilized undercover operations, conducted numerous consensual recordings, grand jury subpoenas, physical surveillance, interviewed witnesses, and interviewed Revis and Nevins. Furthermore, utilizing UCE 4532 in an undercover capacity investigators also communicated with Revis, Nevins, and Bueno via electronic communications with email and SMS (text) messaging. The undercover account utilized by investigators and UCE 4532 was juto1971@gmail.com. Utilizing this email account, investigators communicated with Bueno (tony@auxmg.com), Revis (brevis@auxmg.com), and Nevins (diversifedentrepreneur@gmail.com).

16. Utilizing an undercover operation throughout the investigation, investigators were able to have UCE 4532 certified through the Veterans Affairs (VA) as a Service Disabled Veteran Owned Small Business (SDVOSB). Investigators also established an undercover company known as J&T Industries which was owned by UCE 4532's alias. By establishing the UCE's company as SDVOSB, this allowed UCE 4532 to bid on contracts awarded by the VA procurement system. Additionally, the company was registered in the U.S. federal government's System for Award Management (SAM) which is linked to the VA database. These efforts were undertaken to provide bona fides for UCE 4532 as a

legitimately certified company pursuing government contracts.

17. In August of 2015, a confidential human source (CHS) introduced UCE 4532 at the request of Bueno. Bueno had learned through the CHS that UCE 4532 had received a Center for Veterans Enterprise certification (CVE) and was also a SDVOSB with his own business. This had made UCE 4532 highly marketable for certain federal contracts to be awarded to him/her. After the CHS discussed UCE 4532's situation to Bueno during a consensual recording conducted by investigators, Bueno said in the recording, "Dwane (Nevins) can put this contract out to us…because just between you, me, and the mice on the floor, there are no other vets certified for this contract." Bueno requested the CHS introduce him to UCE 4532 because there was a short timeline to award this contract. During the recorded meeting between UCE 4532 and Bueno, Bueno told the CHS, "Dwane (Nevins) is in our pocket" and Dwane can help 100 percent with awarding contracts to UCE 4532. Bueno further stated that Nevins is a contracting officer for the VA and he is very tight with Bueno's group. Bueno explained to the CHS that they (Revis and Bueno) can manipulate the financial numbers by Nevins providing inside information to ensure UCE 4532 gets the contract by underbidding the competitor.

18. During an undercover operation in August of 2015, Bueno met UCE 4532. During that recorded meeting, Bueno told UCE 4532 about pursuing federal contracts related to medical supplies. Bueno mentioned one in particular, specifically mentioning a $32 million dollar contract for medical supplies and the contract was open to a supplier certified as a SDVOSB in the VA database. Bueno told the UCE that his friend Dwane (Nevins) is the organizing contracting officer who is also a Small Business liason for the VA and can guarantee the contract for UCE 4532. Later in the meeting, Bueno told UCE 4532, "My contact is a government official…that contact can't get legally paid, otherwise it's our ass, we're all in prison and we don't want to look like shit." Bueno further explained to the UCE that he assisted Nevins with setting up a consulting company to co-manage these projects with Auxilious. During the investigation, investigators identified the company known as Diversified Entrepreneur Network (DEN) as the consulting company that Nevins created to make the bribe payments given to him appear legal and not a conflict of interest with his government position. Bueno further explained to the UCE in this meeting that Nevins can do this legally and that Auxilious will assist the UCE navigate through contracts and help pursue contracts for medical supplies. Bueno later explained that while working all together, Nevins can "tee up" the contracts, for Auxilious by informing Auxilious what contracts are available and then Auxilious will locate the company capable of delivering the contracts.

19. On August 19, 2015, UCE 4532 received an email from the SUBJECT ACCOUNT to the undercover email account (juto1971@gmail.com). In the email Revis wrote, "Good morning, per conversation with Tony (Bueno) I have attached a business development consulting agreement with J&T Industries LLC in federal procurement marketplace." Attached to the email was a business development consulting agreement that Revis and Bueno wanted UCE 4532 to sign for their services.

6

20. On September 4, 2015, UCE 4532 received another email from the SUBJECT ACCOUNT to the undercover account where Revis wrote, "I'm confirming our next meeting on Wednesday September 9 at 6pm. Location to be determined. Dwayne Nevins will be attending also." This email was also sent to Bueno. This email was in reference to a meeting that was supposed to have taken place between Revis, Nevins, Bueno, and UCE 4532 to discuss how they would go after contracts. The meeting did not take place due to a conflict that Nevins had.

21. On October 20, 2015, investigators conducted an undercover operation where UCE 4532 met Revis and paid $15,000 dollars as a "consultation fee" to Auxilious. This payment was at the request of Bueno and Revis as a requirement for Auxilious to represent J&T Industries and also have Nevins on board as a government contact that can provide assistance to UCE 4532 in obtaining federal contracts. Prior to the meet, UCE 4532 and Revis utilizing the SUBJECT ACCOUNT exchanged emails revising the Auxilious Business Development Consulting Contract prior to UCE 4532 signing it.

22. During an interview conducted with Revis on August 1, 2016, Revis told investigators that approximately $2,500 dollars was given to Nevins out of the $15,000 dollars given to Revis by UCE 4532. Revis advised that the payment to Nevins was for Nevins giving them direction on which VA contracts would be best to pursue as they related to J&T Enterprises and to which contracting officers to contact. When agents asked why was the money paid to Nevins prior to services being rendered, Revis said he wasn't sure.

23. From November 4-November 6, 2015, investigators conducted an undercover operation in Las Vegas, Nevada. During the operation, Nevins, UCE 4532, and Bueno met several times. During one meeting, UCE 4532 made a bribe payment of $4,500 dollars to Nevins that was orchestrated by Bueno. During this meet, Bueno explained to UCE 4532 that the plan would be for two companies (under contract with Auxilious) would place bids on a VA contract. Bueno would submit UCE 4532's company and Barrett Davidson, who is a disabled small business owner. Beuno then said to UCE 4532, "We'll own all the dogs on the track." This is in reference to a policy/law that the VA has to set a federal contract aside when two certified SDVOSB individuals compete for the same contract allowing only the two companies to bid for that specific contract. During this same meet, Nevins detailed a specific plan on how to use Davidson's business and articulates a plan for Davidson to respond to sources sought as well as UCE 4532 since they have to have two small businesses compete. Nevins explained that Davidson will give the false appearance that there are two separate qualified small business competing. This would allow the contracting officer to set the contract aside for qualified small businesses only since by law the VA has to. Davidson's company would not submit a bid or would submit a bid knowing that it can't actually perform the work and UCE 4532 would become the only bidder and would win the contract. Nevins further explained that he knows Davidson can't perform and they (Bueno, UCE 4532, and Bueno) will simply use Davidson because he is contracted with Auxilious to cause the no competition award the UCE's business. Davidson's company would only be brought in to assist in having the contract set aside for UCE 4532's company, J&T Industries. Revis was not present during the meetings that took place in Las Vegas but did participate in a conference call conducted

between Revis, Nevins, UCE 4532, and Bueno while Nevins, Revis and UCE 4532 were in Vegas.

24. On November 9, 2015, once everyone returned from Vegas, there was a conference call between UCE 4532, Revis, Nevins, and Bueno. During the consensually recorded call, all four individuals discussed two upcoming VA contracts. One is for 30 million dollars and the other is for 1.8 million dollars. Bueno, Nevins, and Revis tasked UCE 4532 what to do and advise the UCE what they need to prepare for submitting proposals. During this call, Nevins confirmed the existence of the contracts and that he is going to send the solicitation numbers to Bueno. Bueno then advised the UCE that once the solicitation numbers are sent by Nevins then the UCE will only deal with Bueno and Revis.

25. On November 9, 2015, UCE 4532 sent an email to Nevins indicating that he/she had not received any emails from Revis about the contract. In response, Nevins sent an email to UCE 4532, Revis to the SUBJECT ACCOUNT, and Bueno. In the email, Nevins wrote, "thanks for the email they cannot set the meeting until they have the requested information from you. Then we will confirm the date. The solicitations is on Fed biz ops I cc Bob (Revis at the SUBJECT ACCOUNT) so he can send you the number to much to email and anybody can pull it up on their computer." Utilizing the SUBJECT ACCOUNT, Revis responded to both of UCE 4532's email and Nevins email replying, "This is the link to DME solicitation; https://www/fbo.gov/index?'s=opportunity&mode=form&id=96ae7a9f52d38029c6f07b88046d429e&tab=core&_cview=1   Because of the complexity and short time to respond we may have to past on this one. The solicitation for the meeting rescheduled from tomorrow to Thursday is the same solicitation you all reviewed this last week in your training meeting. I was not copied on that information so I do not have the specific solicitation number. This if someone can copy or give me specific title I will retrieve the information. Thank you Bob Revis."

26. On November 10, 2015, Revis sent an email utilizing the SUBJECT ACCOUNT to UCE 4532. In the email, Revis wrote, "This solicitation is a great opportunity for J&T Industries! It is a simple medical purchase supply direct to the VA in Salt Lake from the manufacture without the need for interim warehouse storage. The annual contract is estimated to be $310,000 renewable annually for 4 years for total contract of $1.6 million. This is a low risk contract for your consideration. As reviewed last week Auxilious needs the following to proceed: 1. Company bio so I can build a capabilities statement 2. List me as a registered agent for the company as "Government Business POC" a. Robert b. Revis c. US phone 720-346-8887 d. Leave the Company address as shown. 3. Business development funds. If you have questions, please call me to review. We will proceed on this opportunity on your behalf, Bob Revis."

27. On November 11, 2015, Revis sent an email utilizing the SUBJECT ACCOUNT to UCE 4532. In the email, Revis attached a "Statement of Capabilities" that he had created for J&T Industries. Revis also wrote the following, "Draft of SOC (statement of capabilities) attached for your review and comment."

8

28. On November 12, 2015, Revis sent an email utilizing the SUBJECT ACCOUNT to UCE 4532. In the email, Revis wrote, "Attached is updated Capabilities Statement, in consulting with Dwayne (Nevins) on NAICS codes (required for aforementioned SAM application) we have come up with the following list of codes for your company; 334510 Electro medical and Electrotherapeutic Apparatus Manufacturing, 339112 Surgical and medical instrument manufacturing, 339113 Surgical appliance and supplies manufacturing, 541690 Other Scientific and Technical Consulting Services, 541618 Other Management Consulting Services, 541614 Process, Physical Distribution, and Logistics Consulting, 541611 Administrative management consulting services, 621511 Medical Laboratories, 621999 All Other Miscellaneous Ambulatory Health Care Services, 811219 Other Electronic and Precision Equipment Repair and Maintenance. We deleted 423450 Medical, Dental, and Hospital Equipment and supplies merchant wholesalers and 423490 Other Professional Equipment and supplies merchant wholesalers as you will be purchasing from wholesalers. If you are in agreement with this I will update your SAM's record as well, Bob Revis."

29. From November to April 11, 2016, UCE 4532 and Revis utilizing the SUBJECT ACCOUNT exchanged emails related to the status of pursuing contracts with Nevins. Investigators learned during this time period that there had been a falling out between Nevins and Auxilious (Revis and Bueno). Bueno advised the UCE during this time that Nevins was going through personal issues.

30. On December 23, 2015, investigators conducted an undercover operation between UCE 4532 and Nevins. During this meeting, a second bribe payment was paid to Nevins in the amount of $4500 dollars. This bribe payment was to be made at the request of Nevins in order to "get the train moving again" as there had been a stall in progress with Auxilious because of a falling out that Nevins had with Revis and Bueno due to an unpaid debt. According to Nevins, Revis and Bueno owed Nevins $3,000 dollars for past services that did not pertain with anything UCE 4532 was doing. This bribe payment was in exchange for Nevins introducing another subject Jeffrey Perry in order to team UCE 4532 company with Perry's company and go after contracts without Auxilious.

31. Your affiant believes that there is probable cause that Revis has utilized the SUBJECT ACCOUNT as an instrument to coordinate criminal activity related to the conspiracy to fraud the government in attempting to obtain federal contracts and influence a public official to make opportunity for the commission of a fraud on the United States. Your affiant believes that evidence, fruits, and instrumentalities of violations of 18 USC 201(b)(1)(b) are present at the location described. Your Affiant believes that the email content requested will assist investigators in determining if there are other co-conspirators as well as assist in obtaining evidence in the form of electronic communications. Although a UCE was able to infiltrate the organization, investigators were only able to receive communications between UCE 4532 and the subjects. Investigators were not able to obtain electronic communications in the form of emails between the subjects themselves or other possible conspirators. It is your affiants belief, based on the facts above that other emails exist between the subjects that are evidentiary

in nature and will assist with the ongoing investigation.

32. Furthermore, your affiant believes that all though there is a lapse of time from when the email communications and undercover activity ceased between the undercover employee and the subjects, this does not make the historical information requested stale because the written communication being requested could lead investigators to other co-conspirators related to the aforementioned alleged criminal activity.

33. Your Affiant is requesting all email content from the SUBJECT ACCOUNT from September 1, 2013 to July 12, 2017.

34. A preservation request was sent to Microsoft on May 15, 2017 for the brevis@auxmg.com account.

## EVIDENCE

35. Your Affiant knows from training and experience that persons engaged in criminal behavior often communicate with others through correspondence or other documents (whether digital or written) which could tend to identify others involved in the activity. E-mail accounts can also be used as a place to forward or store victim related information, if there are possibly other victims in this investigation.

36. Your Affiant knows from training and experience that the complete contents of e-mail accounts may be important to establishing the actual user who has dominion and control of an e-mail account at a given time. E-mail accounts may be registered in false names or screen names from anywhere in the world with little to no verification by the service provider. They may also be used by multiple people. Therefore, the content of a given account, including the e-mail accounts that send messages to a given account often provides important evidence regarding the actual user's dominion and control of an e-mail account.

37. Your Affiant knows from training and experience that criminals discussing their criminal activity may use slang, short forms (abbreviated words or phrases such as "lol" to express "laugh out loud"), or code words (which require entire strings or series of e-mail conversations to determine their true meaning) when discussing their crimes. They can also discuss aspects of the crime without specifically mentioning the crime involved. In the electronic world, it is even possible to use pictures, images and emoticons (images used to express a concept or idea such as a happy face inserted into the content of an e-mail or the manipulation and combination of keys on the computer keyboard to convey an idea, such as the use of a colon and paren ":)" to convey a smile or agreement) to discuss matters. Keyword searches would not account for any of these possibilities, so actual review of the contents of an e-mail account by law enforcement familiar with the identified criminal activity is necessary to find all relevant evidence within the account.

38. Your Affiant recognizes the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and

in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches. Your Affiant advises it would be impractical and infeasible for the Government to review records produced by a Service Provider and keep only such records as the Government finds to be related to the offenses described herein and in Attachment B during a single analysis. Your Affiant has learned through practical experience that various emails often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole. In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole. Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between e-mail threads, and any respective attachments, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original. In the past, your Affiant has reviewed activity within email accounts pursuant to search warrants in the course of ongoing criminal investigations. Your affiant has learned from that experience, as well as other investigative efforts, that multiple reviews of the activity in the account at different times is necessary to understand the full value of the information contained therein. In order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the emails and data must be assessed within the full scope of the investigation. As such, your Affiant respectfully requests the ability to maintain the whole of the data provided by the Service Providers, and to review the communications in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time. As with all evidence, the Government will obtain the mirrored images in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

39. This application seeks a warrant to search all responsive records and information under the control of Microsoft, a provider subject to the jurisdiction of this court, regardless of where Microsoft has chosen to store such information. The government intends to require the disclosure pursuant to the requested warrant of the contents of wire or electronic communications and any records or other information pertaining to the customers or subscribers if such communication, record, or other information is within Microsoft's possession, custody, or control, regardless of whether such communication, record, or other information is stored, held, or maintained outside the United States.

**REQUEST FOR NON-DISCLOSURE AND TO KEEP ACCOUNT ACTIVE**

40. Pursuant to 18 U.S.C. §§ 2703(b)(1)(A) and 2705(b), your Affiant requests the Court order Provider not to notify any other person of the existence of this warrant. This request is made because notification of the existence of the warrant will result in

11

destruction of or tampering with evidence. Notification would inform the unknown individual(s) of the investigation and allow them to destroy or tamper with information from other yet unidentified accounts which may be related to the investigation.

41. Because the investigation is ongoing, I would further request the Court to order Provider to continue to maintain the account further detailed in Attachment A, in an open and active status.

## CONCLUSION

42. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

43. Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities of 18 USC 201 (b)(1)(b) may be located within the e-mail accounts described in Attachment A.

44. I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment B.

*s/ Scott Alexander*
Scott Alexander, Special Agent
Federal Bureau of Investigation

Reviewed and submitted by Jeremy Sibert, Assistant United States Attorney.

Submitted, attested to, and acknowledged by reliable electronic means on July __25__, 2017.

UNITED STATES MAGISTRATE JUDGE
DISTRICT OF COLORADO